**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Dennis Michael JOHNSON, and Stephen Arthur Baldwin, Defendants-Appellants.**

No. 77–5634.

United States Court of Appeals,
Fifth Circuit.

Jan. 17, 1979.

Juan E. Gavito, Asst. Federal Public Defender, Brownsville, Tex., Roland Dahlin, II, Federal Public Defender, Charles S. Szekely, Jr., Asst. Federal Public Defender, Houston, Tex., for Johnson.

Tony Martinez, Brownsville, Tex., for Baldwin.

J. A. Canales, U. S. Atty., George A. Kelt, Jr., John Patrick Smith, James R. Gough, Anna E. Stool, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before TJOFLAT and HILL, Circuit Judges, and HIGGINBOTHAM *, District Judge.

TJOFLAT, Circuit Judge:

Stephen Arthur Baldwin and Dennis Michael Johnson were found guilty after a bench trial on both counts of an indictment charging possession and conspiracy to possess marijuana with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 846 (1976). The appellants' motion to suppress the marijuana was granted in part and denied in part. On this appeal, they contend it should have been granted in toto. We agree and reverse their convictions.

---

\* District Judge of the Northern District of Texas, sitting by designation.

1. Anzaldua was indicted along with the appellants but pled guilty to the conspiracy count, as

I

As the facts are important, we relate them in some detail. At approximately 5:00 a. m. on July 1, 1977, the appellants and one Juan Carlos Anzaldua [1] entered the United States from Mexico at the Hidalgo, Texas, Port of Entry. Their car, a 1974 Plymouth Duster with Texas plates, was stopped at the border by Customs Inspector Don Whitson. At his request, the driver opened the trunk, whereupon Inspector Whitson detected the odor of marijuana and noticed marijuana seeds in and around the trunk latch. The occupants of the car were then searched. Baldwin produced a pilot's license and the key to room 136 of the Sheraton Motel, Harlingen, Texas. Baldwin said that he and Johnson had flown from Florida to visit Anzaldua but was otherwise reluctant to talk about his plane.

The license plate number and a description of the car were communicated to the Customs Patrol Office in McAllen, Texas, and a request for a "tailout" on the car was made, but that office advised that no patrol units were available near the Port of Entry to follow the car. The car and its occupants were released at approximately 5:25 a. m., and they left the Port of Entry. At approximately 5:45 a. m. the car was found at the Sheraton Motel in Harlingen by Customs Patrol officers dispatched by the McAllen office. The car and the motel were put under surveillance.

Meanwhile, Inspector Whitson had contacted the Federal Aviation Administration Flight Service Station at McAllen and determined that the only private plane from Florida then in the area had landed at the Harlingen, Texas, airport the day before. Several requests for an early refueling of that plane had been received. On the basis of this information, the plane was located at the airport and placed under surveillance by Customs Patrol officers.

a result of which the possession count was dismissed as against him on motion of the Government. He does not join this appeal.

The record does not indicate that any of the three defendants were seen again until 9:00 a. m. the same morning, when Johnson and Anzaldua came out of their motel room and started loading bags and suitcases into the trunk of the car. When they left the motel they were followed to the Harlingen airport. Shortly before they arrived, Baldwin (who, unbeknownst to the surveilling agents, had taken the motel courtesy car to the airport) was seen approaching the airplane to begin a preflight check. When Johnson and Anzaldua arrived at approximately 9:40, they parked the car with its trunk toward the side of the aircraft, and all three defendants began unloading luggage from the trunk and carrying it to the plane. After one white canvas duffle bag had been placed in the plane and a suitcase had been set on the ground near the plane, the Customs Patrol officers approached the defendants and identified themselves. They smelled the odor of marijuana emanating from the trunk of the car. They saw three more bags still in the trunk, one with a tear in its side, through which could be seen some brown paper covered with clear plastic—a type of wrapping that the officers knew from experience was often used around bricks of marijuana. In response to the officers' questions, all three defendants disclaimed knowledge of who owned the luggage or what it contained. They also refused to consent to a search of the bags. They were placed under arrest and given the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The Drug Enforcement Administration (DEA) was notified of the arrest at the airport, and at approximately 10:30 a. m. a DEA agent arrived and was briefed on the situation by the Customs Patrol officers. After consulting by telephone with the United States Attorney's office, the agent returned to the airplane and searched the white duffle bag, which was found to contain bricks of a substance later determined

to be marijuana. This search occurred 45 minutes after the defendants had been arrested. The remaining bags were later searched, without a warrant, at the DEA office in Brownsville, Texas. A total of 195 pounds of marijuana was found in all the bags.

The district court held the stationhouse search of the luggage invalid under *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), but upheld the search at the airport as a valid border search. Alternatively, it held the airport search justifiable under the automobile search exception, *see Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), which it considered applicable to airplanes, *cf. United States v. Brennan*, 538 F.2d 711, 721 (5th Cir. 1976) (noting analogy but declining to hold automobiles and airplanes legally equivalent for fourth amendment purposes), *cert. denied*, 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977). We find we are unable to agree with either ground relied upon by the court below.

## II

■ We consider first the automobile search rationale advanced by the district court. We agree with the court below that the agent had probable cause to search: marijuana seeds had been found in the car at the border, the trunk from which the duffle bag had been removed smelled of marijuana, and suspected marijuana wrappings could be seen through a tear in one of the suitcases.[2] *See United States v. Ogden*, 572 F.2d 501, 502 (5th Cir. 1978) (odor of marijuana provides probable cause to search), *cert. denied*, —— U.S. ——, 99 S.Ct. 564, 58 L.Ed.2d —— (1978). If *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), applies here, however, probable cause alone is not enough; a warrant was required before the luggage could be searched.

---

**2.** Appellant Johnson contends that some of this information was obtained as the result of an investigatory stop that was invalid because not based on reasonable suspicion. We need not decide this question; assuming the stop was valid, the search was nevertheless unconstitutional.

In *Chadwick*, the Supreme Court held unconstitutional the warrantless search of a locked footlocker that had been removed by federal agents from the trunk of a taxicab and taken downtown to the federal building before it was searched. The agents had probable cause to search, but their failure to obtain a warrant rendered the search invalid. The Court rejected the Government's invitation to fashion, by analogy to the automobile search cases, an exception to the warrant clause for personal luggage. The Court distinguished between the privacy interests one could reasonably have in the two types of "effects" and concluded that "a person's expectations of privacy in personal luggage are substantially greater than in an automobile." *Id.* at 13, 97 S.Ct. at 2484. Thus, "when no exigency is shown to support the need for an immediate search, the Warrant Clause places the line [between permissible and impermissible searches] at the point where the property to be searched comes under the exclusive dominion of police authority." *Id.* at 15, 97 S.Ct. at 2486.

 The court below distinguished *Chadwick* on the basis that the duffle bag was loaded on an airplane fueled and ready for takeoff from an airport located near an international border. Since there remained some danger, in its view, that the baggage or its contents might be removed by possible associates of the arrested men, an immediate search was justified. We cannot agree. The facts of this case are that all the luggage was under the complete control of the Customs officers for forty-five min-

utes prior to the search. In *Chadwick*, the Court found that "[t]he initial seizure and detention of the footlocker . . . were sufficient to guard against any risk that evidence might be lost." *Id.* at 13, 97 S.Ct. at 2484–85. Once personal property of an arrestee has been reduced to the "exclusive control" of the arresting officers, an immediate search is no longer necessary or permissible. *Id.*, 97 S.Ct. at 2485.[3] We think it clear that the duffle bag was in the exclusive control of the officers as soon as the pilot of the plane and his confederates had been arrested. *See United States v. Schleis*, 582 F.2d 1166, 1172 (8th Cir. 1978) (en banc) ("Ordinarily, the initial seizure at the time of arrest would be sufficient to place the property within the officer's exclusive control."); *United States v. Stevie*, 582 F.2d 1175, 1179–80 (8th Cir. 1978) (en banc).[4] At that point they could seize and immobilize the duffle bag but not search it. A contrary holding would encourage officers of the law to search luggage routinely at the time of arrest, a procedure manifestly in conflict with *Chadwick's* rationale. *United States v. Schleis*, 582 F.2d at 1172. It is true that *Chadwick* involved a search removed in time and place from the point of arrest, but we refuse to confine the decision to its peculiar facts. *Chadwick* stands for the proposition that a warrantless search of personal property should be the exception and not the rule. Where, as here, the authorities are in control of the situation, they must obtain a warrant prior to searching luggage or similar personal property either on the scene or back at the stationhouse.[5]

---

**3.** One factor supporting the reasonableness of warrantless searches of automobiles is that their size and inherent mobility make secure storage more difficult, thus rendering them "susceptible to theft or intrusion by vandals." *Chadwick*, 433 U.S. at 13 n.7, 97 S.Ct. at 2484. Luggage, by contrast, can easily be kept secure, and there is no reason to believe secure storage facilities were not available in this case.

**4.** The Supreme Court may definitively decide this question this term. *See Arkansas v. Sanders*, —— U.S. ——, 99 S.Ct. 247, 58 L.Ed.2d 236 (1978), *granting cert. to* 262 Ark. 595, 559 S.W.2d 704 (1977).

**5.** At the risk of belaboring the obvious, we emphasize that we should not be understood to suggest that an immediate warrantless search of luggage is never justified. As the *Chadwick* court noted, it would be foolhardy to delay a search if there were reason to believe the luggage contained explosives or some other dangerous instrumentality. 433 U.S. at 15 n.9, 97 S.Ct. at 2485. Moreover, searches of property "immediately associated with" and within the "immediate control" of the arrestee, for the purpose of detecting weapons or protecting evidence, may still be made without a warrant or probable cause. *Id.* at 14–15, 97 S.Ct. at 2485. Also, where the facts support a finding of exi-

The Government urges that the search here is permissible under our decision in *United States v. Soriano*, 497 F.2d 147 (5th Cir. 1974) (en banc), which upheld the warrantless search of a suitcase removed from the trunk of a taxicab as a valid automobile search. *Soriano* is arguably distinguishable from the present case and from *Chadwick*, since we there undertook to decide only the validity of a seizure and search that constituted "one continuous action, homogeneous in character." *Id.* at 150 n.6. It was suggested that the result would be the same, however, if the search were delayed, *id.*, and we can see no difference in principle between the two situations. We therefore accept the Government's contention that *Soriano* would control here but reject the conclusion that that case stands unaffected by *Chadwick*.[6]

▮▮ The Government here makes the argument it expressly declined to make in *Chadwick*—the duffle bag's contact with the airplane[7] was sufficiently prolonged that the search of the bag was good if a search of the airplane would have been valid. This was precisely the rationale of *Soriano*. We agree that the Government could have searched the plane on the spot without a warrant, but, after *Chadwick*, that does not automatically validate the search of the duffle bag. The lessened expectation of privacy in motor vehicles makes warrantless searches of them reasonable in circumstances in which warrantless searches of other property would not be. *See Rakas v. Illinois*, —— U.S. ——, —— & n.15, 99 S.Ct. 421, 433, 58 L.Ed.2d 387 (1978); *id.* at ——, 99 S.Ct. at 436 (Powell, J., concurring.)

The factors which diminish the privacy aspects of an automobile do not apply to respondents' footlocker. Luggage contents are not open to public view, except as a condition to a border entry or common carrier travel; nor is luggage subject to regular inspections and official scrutiny on a continuing basis. Unlike an automobile, whose primary function is transportation, luggage is intended as a repository of personal effects. In sum, a person's expectations of privacy in personal luggage are substantially greater than in an automobile.

*United States v. Chadwick*, 433 U.S. at 13, 97 S.Ct. at 2484. As the Eighth Circuit has pointed out: "Every factor which the Court cites in support of its holding remains present whether the luggage is *inside* or *outside* an automobile." *United States v. Stevie*, 582 F.2d 1175, 1179 (8th Cir. 1978) (en banc) (emphasis in original). The *Chadwick* court was not presented with the argument made here, but the logic of its opinion compels the conclusion that the appellants' expectations of privacy in the contents of the duffle bag were not diminished because it was placed in a conveyance subject to search without a warrant.[8]

---

gency, immediate warrantless searches upon probable cause will be upheld. *E. g., United States v. Fontecha*, 576 F.2d 601, 605 (5th Cir. 1978) (two-on-one nighttime confrontation involving an automobile on a deserted road furnished sufficient exigent circumstances). Here, the court's finding of exigency was clearly erroneous and none of the other exceptions applies.

**6.** Two decisions of this court since *Chadwick* have raised but not decided the question whether *Soriano* survives *Chadwick*: *United States v. Montgomery*, 558 F.2d 311 (5th Cir. 1977); *United States v. Fontecha*, 576 F.2d 601, 604–05 (5th Cir. 1978). Faced directly with the issue, we decide it does not. This issue is now before the Supreme Court. See note 4 *supra*.

**7.** It was an automobile and a footlocker in *Chadwick*, but we have intimated that, for fourth amendment purposes, automobiles and airplanes are substantially identical. *See United States v. Brennan*, 538 F.2d 711, 721 (5th

Cir. 1976), *cert. denied*, 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977). Appellants had a protected privacy interest in the contents of the duffle bag; *Chadwick* speaks of luggage generally, and by placing their property in the duffle bag appellants "manifested an expectation that the contents would remain free from public examination." *United States v. Chadwick*, 433 U.S. at 11, 97 S.Ct. at 2483; *accord, Rakas v. Illinois*, —— U.S. ——, ——, 99 S.Ct. 421, 435, 58 L.Ed.2d 387 (1978) (Powell, J., concurring) (question is whether a person invoking the protection of the Fourth Amendment took normal precautions to maintain his privacy).

**8.** In so concluding, we are in accord with the Eighth Circuit, *see United States v. Stevie; United States v. Schleis*, but not with the Ninth, *see United States v. Finnegan*, 568 F.2d 637, 640–42 (9th Cir. 1977) (dicta).

That the interpretation of the automobile search cases in *Soriano* is no longer good law is made even clearer when it is noted that that case relied almost entirely on the following passage in the Supreme Court's opinion in *Chambers v. Maroney*, 399 U.S. 42, 51–52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970):

> Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the "lesser" intrusion is permissible until the magistrate authorizes the "greater." But which is the "greater" and which the "lesser" intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

The Government argues that *Chambers* was left intact, indeed reaffirmed, by the *Chadwick* court. We agree, but the Court in *Chadwick* also said:

> Respondents' principal privacy interest in the footlocker was of course not in the container itself, which was exposed to public view, but in its contents. A search of the interior was therefore a far greater intrusion into Fourth Amendment values than the impoundment of the footlocker. Though surely a substantial infringement with respondents' use and possession, the seizure did not diminish respondents' legitimate expectation that the footlocker's contents would remain private. *It was the greatly reduced expectation of privacy in the automobile, coupled with the transportation function of the vehicle, which made the Court in* Chambers *unwilling to decide whether an immediate search of an automobile, or its*

*seizure and indefinite immobilization, constituted a greater interference with the rights of the owner. This is clearly not the case with locked luggage.*
433 U.S. at 13–14 n.8, 97 S.Ct. at 2485 (emphasis added). This language reaffirms *Chambers* as to the special case of automobiles but disapproves the extension of its rationale to luggage. Notwithstanding the presence of ample cause to believe the duffle bag contained contraband, the warrantless search in this case cannot be sustained.

### III

■ We turn now to the border search argument. Persons and property crossing the border into this country may be searched at the border without a warrant or probable cause. Such searches "are reasonable simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 1979, 52 L.Ed.2d 617 (1977); *accord, Almeida-Sanchez v. United States*, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973); *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925); *United States v. Brennan*, 538 F.2d 711, 714–15 (5th Cir. 1976), *cert. denied*, 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977). Beginning with its opinion in *Almeida-Sanchez*, the Supreme Court has repeatedly emphasized a distinction between searches conducted at the border or its "functional equivalents," and searches at other points within the country. The former may be made without probable cause or a warrant, the latter may not. *United States v. Ortiz*, 422 U.S. 891, 897, 95 S.Ct. 2585, 2589, 45 L.Ed.2d 623 (1975); *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975); *Almeida-Sanchez v. United States*, 413 U.S. at 272–74, 93 S.Ct. at 2539–40. Since the search disputed here was not performed at the border, it can be upheld as a border search only if it took place at the functional equivalent of the border. *See United States v. Brennan*, 538 F.2d at 714–15.[9]

---

**9.** *Almeida-Sanchez* and its progeny announced rules concerning the validity of searches and seizures by Border Patrol agents. The search here was conducted by Customs Patrol officers,

A particular *place* removed from the border may be the functional equivalent of the border because of its physical characteristics and the nature of the traffic flowing through it. *E. g., United States v. Reyna,* 572 F.2d 515 (5th Cir. 1978); *United States v. Alvarez-Gonzalez,* 542 F.2d 226 (5th Cir. 1976).[10] Also, a particular *search* may be the functional equivalent of a search at the border if the object of the search has been kept under constant surveillance from the border to the point of search. *See, e.g., United States v. Fogelman,* 586 F.2d 337, 342–345 (5th Cir. 1978).[11] These two meanings for functional equivalence were foreshadowed in the *Almeida-Sanchez* opinion.[12]

The district court perceived the search of the duffle bag to be of the latter type, an extended border search. In support of its holding, however, the court below cited only pre-*Almeida-Sanchez* cases.[13] Those cases required only that the searching officers have a "reasonable suspicion" that customs laws were being violated and that the object of the search have a "nexus" with the border. Without commenting on their holdings, we think the reasonable-suspicion/border-nexus language employed in those decisions is overly broad by *Almeida-Sanchez* standards. *See United States v. Brennan,* 538 F.2d at 719 n.9. Although "a border crossing is not the *sine qua non* of a valid border search," *United States v. Fogelman,* 586 F.2d 343, this is true only in the sense that the officers need not actually observe a border crossing in order for their search to be reasonable; that a crossing has occurred may be inferred by the officers from circumstantial facts known to them. *See, e.g., United States v. Adams,* 569 F.2d 924, 925 (5th Cir. 1978) (agents could infer from fresh mud on tires and fenders of truck and lack of recent rainfall that crossing of Rio Grande had occurred). A search is not a valid border search unless it appears by a preponderance of the evidence,[14] direct or circumstantial, that a border crossing has occurred.[15] As the Supreme Court

or, more precisely, by a DEA agent working in cooperation with Customs agents. The distinction is not significant. In *Brennan* we held, in an exhaustive and scholarly opinion by Judge Clark, that "*Almeida-Sanchez* applies equally to Customs and Border Patrol searches." 538 F.2d at 719.

10. In *Reyna,* we determined that the Border Patrol checkpoint at Sarita, Texas, is the functional equivalent of the border on the basis of three major factors: the relative permanence of the checkpoint, the predominance of international over domestic traffic through the checkpoint, and the practical necessity for the checkpoint as a substitute for monitoring traffic at the actual border. 572 F.2d at 517.

11. The *Fogelman* opinion neither cited *Almeida-Sanchez* nor made any specific reference to the functional equivalence concept; the search was upheld as a valid "extended border search." This is a semantic difference only. Properly conceived, an extended border search is the functional equivalent of a search at the border since the object under surveillance "brings the border with it" to the point of search. *See United States v. Brennan,* 538 F.2d at 715.

12. For example, searches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches. For another

example, a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search.

413 U.S. at 272–73, 93 S.Ct. at 2539.

13. *United States v. Steinkoenig,* 487 F.2d 225 (5th Cir. 1973); *United States v. Martinez,* 481 F.2d 214 (5th Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 489 (1974); *United States v. Thompson,* 475 F.2d 1359 (5th Cir. 1973). *Martinez* and *Steinkoenig* were actually rendered after the date of decision in *Almeida-Sanchez* but involved searches conducted prior to that date. We subsequently held that *Almeida-Sanchez* applied only to searches conducted after its date of decision. *United States v. Miller,* 492 F.2d 37, 42 (5th Cir.), *aff'd per curiam en banc,* 499 F.2d 1247 (1974), *cert. denied,* 422 U.S. 1056, 95 S.Ct. 2679, 45 L.Ed.2d 708 (1975). In light of *Miller,* the discussion of *Almeida-Sanchez* in *Steinkoenig* is dicta.

14. Whether there has been a border crossing is a question of fact that, like any other at a suppression hearing, need be established only by a preponderance of the evidence. *See United States v. Matlock,* 415 U.S. 164, 177 n.14, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974).

15. The trucks that were searched in *Fogelman* had not crossed the border, but the agents had watched them being loaded with marijuana

put it in a recent case upholding customs searches of incoming international mail: "[t]he *critical fact* is that the envelopes cross the border and enter this country . . . . . It is their entry into this country from without it that makes a resulting search 'reasonable.'" *United States v. Ramsey*, 431 U.S. 606, 620, 97 S.Ct. 1972, 1981, 52 L.Ed.2d 617 (1977) (emphasis added).

█ It is on this "critical fact" that the Government's case founders. On this record, there is simply no reason to believe that the duffle bag or its contents came across the border. The bag was not in the car when it was searched at the border. The first time the duffle bag was seen was when Johnson and Anzaldua brought it out of the motel and put it in the car. For all that appears, the luggage or the marijuana could have been in the motel all the time or could have been picked up by the defendants after they left the border and taken inside the motel before the agents arrived. This is not a case like *United States v. Martinez*, 481 F.2d 214 (5th Cir. 1973), *cert. denied*, 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 489 (1974), relied upon by the court below. The search upheld there occurred six days after the truck crossed the border. The vehicle was kept under constant surveillance for that entire period except for one hiatus of thirty-five minutes just after the border crossing. The court noted specifically, however, that the agents had a tip that the truck would be carrying 600 pounds of marijuana in a secret compartment, and, when actually searched, it took the agents more than an hour to unload it. *Id.* at 218–19 n.9. The facts clearly supported · the inference that the marijuana was in the truck when it crossed the border.[16] *Accord, United States v. Fogelman*, 586 F.2d at 343. In the case now before us, at least twenty minutes elapsed between the search at the border, which revealed no luggage in the car, and the start of surveillance at the motel. It would have taken only a few minutes to pick up the luggage or the grass on the way; if, indeed, they were not already in the motel. The facts of this case provide no basis whatsoever for a belief that the luggage or its contents crossed the border.

█ At oral argument, the Government cited to us two cases in this circuit upholding extended border searches conducted since *Almeida-Sanchez*: *United States v. Brom*, 542 F.2d 281 (5th Cir. 1976); *United States v. Flores*, 531 F.2d 222 (5th Cir.), *cert. denied*, 429 U.S. 976, 97 S.Ct. 484, 50 L.Ed.2d 584 (1976). The facts of both cases are nearly identical. The search of a car at the border revealed traces of marijuana. The car was released but followed to a motel in a nearby town. A second car drove up and the occupants of the two cars met in the motel. The occupants then returned to their respective cars and drove off. Nothing was seen to be transferred from the first car to the second. Both cases held that a search of the *second* car was justified as an extended border search because of its contacts with the first car and its occupants.[17] They appear to stand for the proposition that anything that comes in contact with a person or vehicle that has crossed the border may be searched as an

from a boat that had come from international waters. 586 F.2d at 343. The contraband, the object of the search, had crossed the border and this validated the search.

16. *Martinez* was decided under pre-*Almeida-Sanchez* law. See note 9 *supra*. The decision is nonetheless consistent with the principles applied here.

17. We do not wish to oversimplify the facts. In both cases, the occupants of the cars were seen to engage in other activities which appeared suspicious. In neither case, however, was there any evidence that contraband had been moved from the first car to the second. It is true that in *Brom* the occupants switched cars at one point and in both cases all the occupants met together in one motel room. But to say that once a person crosses the border, any car he gets into or someone he meets gets into can be searched without a warrant, for that reason alone, goes too far. *But cf. United States v. Markham*, 440 F.2d 1119, 1121–22 (9th Cir. 1971) (if agents are reasonably certain that a person has crossed the border illegally, they may stop and search a car he enters after crossing).

extended border search.[18] With all due respect to the panels that decided those cases, we do not see how they can be squared with *Almeida-Sanchez* and the other Supreme Court border search cases discussed in this opinion. Both cases involved searches conducted well after *Almeida-Sanchez* was decided, yet neither even mentions, let alone discusses, that case. Both were decided entirely on the basis of pre-*Almeida-Sanchez* case law. We can see no principled way to distinguish these cases from the one before us, but we have an overriding obligation to follow Supreme Court precedent.[19] We hold that *Almeida-Sanchez* and its progeny require us to find the present search unconstitutional.

## IV

For the foregoing reasons, the decision of the district court is REVERSED and the cause REMANDED for proceedings not inconsistent with this opinion.

JAMES C. HILL, Circuit Judge, specially concurring.

I concur. I write briefly to highlight the considerations which have led me to conclude that this rather abrupt change in our Circuit's law is required by an intervening decision of the Supreme Court.

We have dealt with warrantless searches of automobiles and other containers which have been upheld upon a finding of probable cause and exigency despite defense contentions that the exigency could have been overcome by the mere immobilization of the automobile or container, which would thus have provided the law enforcement officials ample time to have obtained a warrant. Our reading of *Chambers v. Maroney*, 399 U.S. 42, 51–52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), has brought this Court to the conclu-

sion that the combination of probable cause and circumstances so exigent as to authorize a warrantless *seizure* is *a fortiori* authority for a warrantless *search*. *United States v. Hand*, 516 F.2d 472 (5th Cir. 1975) (*en banc*); *United States v. Soriano*, 497 F.2d 147 (5th Cir. 1974) (*en banc*). *See also United States v. Gaultney,* 581 F.2d 1137 (5th Cir. 1978); *United States v. Fontecha*, 576 F.2d 601 (5th Cir. 1978); *United States v. Montgomery*, 558 F.2d 311 (5th Cir. 1977); *United States v. De La Fuente*, 548 F.2d 528 (5th Cir. 1977).

Just prior to the search and seizure in the instant case, the Supreme Court decided *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). In *Chadwick*, the Court dealt with a situation in which the law enforcement officers had proper custody and complete control of the container, a footlocker. The Court held that the warrantless search of the contents of the footlocker violated the Fourth Amendment. However, the Court did not address the constitutionality of any seizure of the footlocker which apparently preceded the search. *Id.* at 7 n. 3, 97 S.Ct. 2476. The Court did not find it necessary to reach the issue whether a constitutional warrantless seizure automatically removes the exigency basis for a subsequent warrantless search. *See Arkansas v. Sanders*, 262 Ark. 595, 559 S.W.2d 704 (1977), *cert. granted*, —— U.S. ——, 99 S.Ct. 247, 58 L.Ed.2d 236 (1978).

Here, we are dealing with articles, personal luggage, which had to be seized in order to be searched. Thus we have analyzed the seizure against the standards of probable cause and exigency which, before *Chadwick*, have been applied in this Circuit to both the seizure and the subsequent search. Clearly, in this case, the law enforcement officers had proper grounds for the initial warrantless seizure. Had not

---

**18.** This yields some startling results. Carried to its logical conclusion it would mean that if a man crossed the border and was followed to his house, the house could be searched without a warrant or probable cause because someone who had recently crossed the border had come in contact with it. *But see Rakas v. Illinois*, —— U.S. ——, ——, 99 S.Ct. 421, 433, 58

L.Ed.2d 387 (1978). (Cars and houses not the same under fourth amendment).

**19.** It is the general rule that one panel cannot overrule the decisions of another. Neither *Flores* nor *Brom*, however, construed *Almeida-Sanchez* or considered its effect on prior circuit law. We simply decline to follow them in obedience to the Supreme Court.

*Chadwick* intervened, I should have concluded that these grounds also authorized the subsequent search. However, when the condition precedent of seizure had occurred, we find this luggage "properly in [the] possession" of the law enforcement officers. At that point, the instant case cannot be distinguished from *Chadwick* as presented to and decided by the Supreme Court. Articles of this sort may properly come into the custody of law enforcement officers in any number of ways which did not concern the Supreme Court in *Chadwick* and which need not concern us here.

When exigencies can be eliminated by the exercise of the authority to immobilize luggage through a warrantless seizure, the warrantless activity must end there, and a warrant is required to search the contents of the luggage, absent some other warrant excusing exigency. Here, the warrantless activity did not cease with the seizure. Therefore, the subsequent warrantless search was invalid.